### UNITED STATES REPAIR & GUARANTY CO. v. ASSYRIAN ASPHALT CO.

(Circuit Court of Appeals, Seventh Circuit.    April 16, 1900.)

#### No. 633.

PATENTS—INVENTION—METHOD OF REPAIRING ASPHALT PAVEMENT.

The Perkins patent, No. 501,537, claim 1, for a "method of repairing asphalt pavements, which consists in subjecting the spot to be repaired to heat, adding new material, smoothing and burnishing it, substantially as described," cannot be limited by construction to a method in which the heating is done by means of sending a flame blast into direct contact with the pavement, in view of the language of the specification, in which the patentee expressly states that "the heating of the surface may be accomplished in various ways, and by means of various forms of apparatus, and * * * I do not limit myself to any particular form of apparatus"; and without such limitation the claim is void for lack of novelty, in view of the prior art, and especially of the French patent to Crochet.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The bill charged infringement of three letters patent (Nos. 501,537, 542,349, and 560,599) issued to Amos H. Perkins,—the first for a method, and the other two for apparatus, for repairing asphalt pavement. The second was dismissed out of the case. The last the court adjudged valid and infringed, but declared the method of the first unpatentable, because anticipated by the French patent (No. 137,208) issued on June 11, 1880, to Paul Crochet. 96 Fed. 235. The appeal is from this part of the decree. The following are the claims of the method patent; infringement of the first, only, being asserted: "(1) The method of repairing asphalt pavements, which consists in subjecting the spot to be repaired to heat, adding new material, and smoothing and burnishing it, substantially as described. (2) The method of repairing asphalt pavements, which consists in subjecting the spot to be repaired to heat until the material is softened, agitating it, and mixing with it new material, and finally smoothing and burnishing it, substantially as described." The file wrapper shows that the application contained a third claim, reading as follows: "(3) The method of repairing asphalt pavements, which consists in subjecting the spot to be re-

paired to a strong blast of heat, adding new material, and smoothing and burnishing it, substantially as described." The patent office taking the position that the first and third claims "are the same in substance, differing only in degree, and both cannot be permitted to remain in the case," the petitioner chose to retain the first. The specification contains the following statements: "My invention is designed to produce a method whereby the repairing of asphalt pavements may be quickly and cheaply accomplished, and a neater-appearing pavement be obtained after repairing than has heretofore been the case. * * * Heretofore, in the repairing, it has been customary to dig out with a pick or other instrument the surface material around the spot to be repaired; sometimes applying heat to the spot to soften the material so that it may be more easily removed. When the material has been removed, the depression thus made is thoroughly cleaned, and given a coat or dressing of tar. New material in a heated state has then been placed in the depression, and been ironed down and smoothed off in the usual manner of finishing; the tar acting as a solder to hold the new material in place. * * * In practicing my invention, however, I subject the spot to be repaired and the surrounding edges to such a degree of heat that the surface asphalt (not only the exact spot to be repaired, but the surrounding portion, to a greater or less degree) is reduced to the soft, pliable state in which it is originally laid. With a rake or other suitable instrument it is then agitated, and mixed with enough new material to fill up the spot to be repaired. It is then subjected to the usual finishing operation of ironing and burnishing. The heating of the surface may be accomplished in various ways, and by means of various forms of apparatus; and, while I have herein shown but one form for accomplishing the result, yet I would have it understood that I do not limit myself to any particular form of apparatus for carrying out my invention." Then, after explaining how, by a particular apparatus, of which an illustrative cut is shown, "a strong blast of heat is projected against the surface of the asphalt, and readily melts it," the specification proceeds: "As explained above, when it is desired to repair a spot the apparatus is moved adjacent thereto, with the burners directly above the spot. These soon reduce the surface asphalt, both at the spot and at the surrounding edges, to a pliable state; the strong blast causing, not only the immediate surface, but the particles deep down, to be melted, and yet not burned. With a rake or some other suitable instrument the operator then agitates or stirs up the softened material, and, by adding new material of substantially the same degree of softness, the spot or depression to be repaired is filled up, and subjected to the usual smoothing and finishing operation, as in the case of a new pavement. This, as will be seen, is done without the use of the tar for the purpose of uniting the parts or sections of material, and is done without any distinct dividing line between the old and new material. In fact, there is no dividing line, because the new material has been mixed with, and becomes a part of, the old material. As stated above, while heating the spot to be repaired the surrounding edges or portions must be heated to a greater or less degree, and the new material is worked into those edges as well as in the spot to be repaired, so that when hardened it is practically impossible to tell where the pavement has been repaired." Concerning the question of infringement, the record contains a stipulation that the defendant used an apparatus, resembling that described in the patent of the complainant, under the hood of which the pavement to be repaired was exposed to a blast of flame "until sufficiently softened to the depth of a half inch or more"; that, the apparatus being then removed, the softened part of the asphalt was thereupon "scraped out with rakes, hoes, or suitable tools, to the depth of one-half inch or more," and thereupon fresh asphalt composition, in a heated state, was filled into the depression or space so scraped out, and leveled, smoothed, and burnished with heated irons, and the other usual tools for such purposes.

This patent was held invalid by Judge Coxe in the case of United States Repair & Guaranty Co. v. Standard Pav. Co. (C. C.) 87 Fed. 339. After a consideration of the contention of the complainant "that the Crochet patent related to a totally different process," the opinion concludes as follows: "But assume that the complainants are correct in their construction of the Crochet patent; how then stands the case? Before the Perkins patent, it was known that heat could be used to soften a Trinidad asphalt pavement at the spot

to be repaired. The Perkins patent so says. It was also known that rock asphalt and bitumen pavements could be mended by heating the top layer, removing the material with a notched hoe, adding new material, and tamping it in the ordinary way, so that the part repaired could not be distinguished from the adjacent parts. Did it involve invention to do this to a pavement made of Trinidad asphalt? Would not a mere tyro in paving, with Crochet's furnace, rake, and description before him, know enough to practice his method on any pavement of asphalt or equivalent material? If not, then it must follow that should a new variety of asphalt be discovered, or should the constituents of the present surface material be changed, the person who is first to use the patented method in connection with the new material can secure a patent, even though the patents of Perkins and Crochet on their face cover asphalt pavements of all kinds. In Manufacturing Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307, it was argued that the patent, which covered a process of tempering coiled springs, could be sustained because the patentee discovered that the application of heat would restore the lost strength and elasticity of the wire; that he was the first to apply heat to springs which had been weakened by use; and that his discovery was the new application of an old process, and the production of a new result thereby. The supreme court rejected this argument and voided the patent, observing, 'But we are of opinion that the same principle set forth in the patent was developed in the manufacture of the wire bells for clocks and of the hair balance springs, that there was no patentable invention in applying that principle to the springs mentioned in the specification, and that the case is merely one of a double use.' See, also, Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Phillips v. City of Detroit, 111 U. S. 604, 4 Sup. Ct. 580, 28 L. Ed. 532; Frederick R. Stearns & Co. v. Russell, 29 C. C. A. 121, 85 Fed. 218. The court is convinced, in view of what this record discloses, that it would be inequitable to place the entire art of repairing asphalt pavements by heat under tribute to the Perkins patent in suit. He should be satisfied with the rewards which flow from his contribution to the art which are secured by another patent."

The decree of the circuit court was affirmed by the court of appeals for the Second circuit, but on the ground of noninfringement. United States Repair & Guaranty Co. v. Standard Pav. Co., 37 C. C. A. 28, 95 Fed. 137. That court, recognizing it to be true, as contended, that the application of heat to rock asphalt reduces it to sand or powder, which does not unite firmly with the old material, said: "It is, however, noteworthy that Crochet thought that the beneficial effect of his process was to soften the subjacent layer of the French pavement so that it should 'unite perfectly with the new layer, and form with it a thickness, without solution of continuity.' Nevertheless there is in fact a difference in the material of the two pavements, and we are inclined to differ from the circuit court, and to regard the Perkins patent as patentable, because it was an application of an old process of intense heating, by means of a movable furnace, to different and dissimilar materials. The two processes were not exactly alike. Crochet treated the surface by vivid heat, removed the damaged part, roughened the remaining surface, and added new material. Perkins heated in the same way, reduced the old material to a soft, pliable state, agitated it with a rake, and mixed it with enough new material to fill up the spot to be repaired. * * * The Perkins process places stress upon the perfect commingling of old and new asphalt as a result of the agitation of the particles of old and new material. The defendant's process places no reliance upon this kind of commingling, but scrapes or cleans out the depression, sprinkles a little cement upon the bottom and edges, to be of some benefit in causing the old and new to adhere, and shovels in and tamps down the new material. Wherein the defendant's process differs from that of Perkins, it corresponds with that of Crochet."

The process of the Crochet patent, dated June 11, 1880, the specification describes as follows: "It consists in reheating the part to be mended by means of a movable furnace, which the operator shifts about at the surface of the roadway until such portion decrepitates and becomes friable. The upper part of the layer of asphalt and that which has been damaged are

taken off by means of an iron scraper armed with small teeth, which perform the office of a rake. Said scraper, in raising the material, forms at the same time upon the part remaining numerous striæ, which render the surface wrinkled, and augment the adherence of the additional overthickness which constitutes the recharge." Crochet's claim is for an invention "presenting, as distinctive characteristics, the points following: (1) The softening of the upper surface of the asphalt layer at the part to be repaired, and the removal ,of such upper surface by·means of a toothed scraper which striates the part remaining. (2) Recharging, by the addition upon the surface thus softened of an asphalt layer of convenient thickness, which is tamped by the usual means. (3) The movable furnace which I have combined to such end, according to the conditions described and represented."

Mr. Dayton, an expert witness for the appellant, in the course of his original examination testified: "In this connection it should be stated that while the patent makes no mention of the removal of any of the old material, in practice the surface of the old material, after being melted or softened, is taken off to a little depth,—say, half an inch to an inch,—as found convenient. By doing this, the powdered cement which was applied to the original surface of the pavement when fresh, and any and all impurities and foreign substances which may have been pressed into the surface of the pavement in use, are removed, and a fresh surface of asphalt composition is exposed for union with the new similar material added to fill the place level with the general pavement around it. * * * The scraping off of the surface of the old pavement after softening it, to the extent of half an inch or so, is not, in my opinion, a departure from the invention set forth in the patent, and is only what I understood the patentee of complainant's patent promptly commenced to do in the early practice of the method referred to. Moreover, it is, in my judgment, only what a judicious workman would do in order to get rid of the powdered material and impurities originally placed upon the surface of the pavement or subsequently accumulated therein, so as to give a fresh surface of the old material for contact and union with the fresh new material added. It is only a question of adding so much more of the new material to make up for the old material scraped away. * * * There are three steps or process elements enumerated in this claim, to wit: First, 'subjecting the spot to be repaired to heat'; second, 'adding new material'; and, third, 'smoothing and burnishing.' * * * If the removal by defendants of a shallow portion of the surface asphalt * * * be regarded as a difference from the patent, it is, nevertheless, in my judgment, not a departure from the patent, but is merely the addition of a step to the three steps enumerated, and one which, moreover, does not affect the character or result of said three steps, further than it is a prudent expedient. to make said three steps the more effective. I do not overlook the fact that the specification of the patent 501,537 provides for an additional step, namely, the agitation or stirring up of the softened material of the old pavement preliminary to the addition of the new material. But this is not included in claim 1 here in suit. On the other hand, it appears to be expressly excluded from said claim by its specific inclusion in claim 2. * * * X-Q. 51. If the degree of heat were such as to not only melt, but also to burn, the immediate surface, and as well 'the particles deep down,' would such procedure be an infringement of Perkins' method, claim 1, assuming that the old layer thus burned were raked away clean before the new filling was supplied? A. I think it would. There must be a melting in advance ·of the burning, and the removal of the burned part would leave the unburned and melted part in condition for direct union with new material added to fill the place."

On his examination in rebuttal: "The Crochet patent proposes the employment of a fire box having a grate bottom, and containing (we will assume, as most favorable to the patent and device) a body of live coals. At some distance below the grate is supported a sheet-metal plate, which in turn is held a little above the surface of the pavement. The plate is heated by radiation from the coal fire on the grate, and the surface of the pavement is heated by radiation from the plate. The heat which reaches the pavement is therefore a secondary radiation from the coals. * * * This is not the mode of operation of the apparatus set forth in the Perkins method

patent. This Perkins apparatus employs a flame blast sent directly and continuously against the surface of the pavement to be softened. * * * Beneath a thin, stiff crust formed by the Perkins method, where the blast flames directly impinge, the asphalt mixture is uniformly softened to any desired depth or shallowness, regulated by the time during which the flame blast is continued thereon. * * * After the removal of this crust a softened, loosened, and rough surface of old material is presented for union with the new. * * * It appears to me that the difference between the Crochet and the Perkins modes of applying heat to the pavement, irrespective of the difference between the pavements themselves, is to be regarded as an essential difference between the two methods of repair, considered as entireties, and that the Crochet patent is not an anticipation of the methods set forth and claimed by Perkins. * * * Notwithstanding this is shown by the record clearly to have been done only upon rock asphalt or 'compressed asphalt' pavement, and is not shown to have been done upon American 'asphalt mixture' pavements, or by any one indicating a knowledge of the existence of American asphalt mixture pavements, such prior art may possibly be regarded as having a bearing upon the method described and claimed by Perkins. If so, it is still plain that Perkins' method is characterized by a new and useful way of applying the heat to the pavement, to wit, by sending a flame blast into direct contact with the pavement surface. * * * Wherefore, regarding the Perkins method, as distinguished by his different, more expeditious, and more effective way of applying heat,—to say nothing about any higher degree of heat finally imparted by his method, and nothing about the difference in material upon which the old and new methods have respectively been practiced,—I regard the Perkins method as essentially new, and as being unaffected by the disclosures of the prior art in this record. * * * It is a stated object of the Perkins invention that it 'is designed to produce a method whereby the repairing of asphalt pavements may be quickly and cheaply accomplished,' as well as whereby 'a neater-appearing pavement [may] be obtained after repairing.' There is, in my judgment, no question that, by this Perkins method, repairs may be effected more 'quickly and cheaply' than by any method disclosed in the prior art, because of his application of the heat to the pavement by blast-flame contact. There is no slow operation by radiation, and there is no delay occasioned by the heating of a plate in a furnace, nor is there any such delay and trouble as must attend the handling of such a plate. Nor is there delay and expense due to the establishment of a thoroughly incandescent coal fire, nor such inequalities of heating at different points as accompany a coal fire resting upon a grate or over a radiating plate, due to the deposit of ash or to unequal incandescence. This feature of Perkins' method is not dependent upon a particular apparatus. The patent so states, and, as a matter of fact, different and improved 'forms of apparatus,' affecting the efficiency of the method, have since been devised. These all retain the obviously best idea of using a liquid fluid, but this is not essential to a flame blast, and, of course, not essential to contact of the flame with the pavement surface. Hence, in my judgment, it would not be correct to say that the invention is one of apparatus, and not of method. ' * * * The patent shows and describes only a kind of apparatus which gives a flame blast, and directs the flame into contact with the surface of the pavement. In other words, the Perkins patent and the method therein set forth contain the idea of heating the pavement on the principle of 'transmission,' as distinguished from 'radiation' and 'convection,'—the three recognized principles of heat transference. It may be added that the patent is the first disclosure in the art of any apparatus by which heat may practically be imparted to an asphalt pavement on this principle. * * * If the court cannot find in the difference between the American and the French asphalt pavement materials sufficient ground for recognizing patentable novelty in the Perkins invention over the prior foreign art, it seems to me said Perkins' method is amply distinguished from such prior art by its mode of heating the pavement on the principle of transmission by flame contact, without regard to the 'form of apparatus' by which such flame contact may be effected. * * * It is a fact that a thin, continuous crust or scale is formed at the top of the pavement material **where the flames impinge thereon. * * * The scale * * * appears**

to wholly prevent the burning or impoverishment of the cement beneath it, so that the latter is in fact only melted, and is apparently as rich, bright, and efficient as ever. * * * In practice, this scale or crust is pulled off before adding the new mixture, together with some of the melted material beneath it. * * * Undoubtedly the small amount of mixture formed into the crust or scale is impoverished by action of the flames immediately thereon,—by which I mean that the bitumen and oil actually reached by the flames are probably burned out. But, by reason of its continuity and density this scale serves to protect the mixture beneath it in a manner evidently calculated to prevent impoverishment thereof, and, on the other hand, to secure a mere melting of such subjacent material, even though the remelting be continued to a considerable depth by prolonged application of the flame to the scale. From one to three minutes is all the time necessary to continue the application of the flame-blast heat of the Perkins method to accomplish deep enough melting of the pavement for the purpose of repair."

The following extracts are from the testimony of Charles Elwood Foster, an expert for the appellant, examined in rebuttal: "I understand from the use of the expression 'enough new material to fill up the spot to be repaired' that some of the old material is removed, for otherwise there would be no space to be filled up. The removal of a certain portion of the old material in most cases is necessary, because it is not desirable that the spot which is repaired shall be at a higher level than the surrounding portions of the pavement. [But for this, it might be supposed that repairs commonly are made in order to fill depressions caused by wear.] * * * Reference is also made to filling up the depressions, from which it is evident that the patentee recognizes that a certain portion will be removed, to be replaced by the new material. * * * While I do not find it specifically stated in claim 1 that the heated part is to be agitated, I do find that claim 1 calls for the heating, that the heating is for the purpose of permitted agitation, and that it calls for adding the new material, which can only be effected as described in the specification by first agitating the heated part of the old material. Claim 1 does not call for the mixing of the old and the new material together, but when the old material is agitated or picked up the addition of new material causes the two to be mixed along the line of union, as a necessary sequence to the operations. * * * In some instances, as where the foundation sinks below new pavement, it is not necessary to remove any portion of the surface material, the thin layer carbonized or burnt by the action of the heater being so small in quantity that it may be mixed with the fresh material without detriment. * * * The only effect of the operations specified in the Crochet patent which, to my mind, is attended with any advantage, is the disintegration of the pavement by the heat of the tray which is carried over the pavement, which facilitates the removal of the portion heated, differing in this respect from the effect of heating a pavement of asphalt mixture; and I recognize 'that, by 'the repeated passage of the movable furnace' referred to in the Crochet patent, the rock asphalt pavement might finally be disintegrated to any desired depth, so as to permit the introduction of a very substantial plug of new material. * * * Apart from the fact that the patentee, Crochet, makes no statement as to whether the fresh material is to be hot or cold, I still find that the Crochet patent does not set forth the process of the patent in suit, because it does not describe a process embodying the same operations upon the same material to secure the same result. If I assume that the operations specified in the Crochet patent are the same as those set forth in the patent in suit, their effect on the material is so entirely different in its characteristics that it does not constitute the same mode or process, any more than a series of steps upon sirup to clarify it constitute the same process as the same steps upon coal oil to refine it. * * * It is true that the Crochet patent sets forth that, by the application of heat to the surface of a rock asphalt pavement, the heated portion of the latter may be disintegrated and readily removed; but no one, on being made acquainted with this fact, which was known before the date of the Crochet patent, would know that it would be practicable to operate upon the surface of a compressed asphalt pavement without disintegrating it, but merely so as to melt and soften and reduce it to the pasty condition in which it was laid. * * * Naturally any one skilled in the art would assume that the application of sufficient heat to secure the softening of the lower body of material would

result in practically destroying or burning out so much of the material as would defeat the purpose of the operation. It is only from actual experiment that one learns the fact that upon the application of a blowpipe blast as suggested in the patent in suit there at once forms upon the extreme upper surface a thin carbonaceous crust, which practically protects all of the material below from overheating, and reduces it to a pasty or molten condition for a considerable depth. * * * There is no intimation in the French patent of any modification of the process in its application to different purposes, and therefore any one literally following the said patent upon an asphalt mixture pavement would destructively burn the latter. * * * X-Q. 38. In the practice of the Perkins method, should it transpire that some part of the material were burned at the place of treatment, would such burning avoid the Perkins method? A. It would not. Occasionally this would result from the carelessness of the men, but Perkins was, I believe, the first one to disclose the fact that it was possible to direct a strong blast of hot gases onto the surface of an asphalt mixture pavement without materially burning the same, or affecting the part below the heated portion. * * * Yes; I do draw a sharp distinction between the 'asphalt mixture' pavements, such as are used here in the United States, and the 'compressed rock asphalt' pavements, such as are used in Europe, because I understand that, to embody a process, there must be substantially the same operations upon the same materials to get practically the same result; and in making a comparison I do not consider the materials to be substantially the same when the effects of the operations are so radically different, as I have pointed out, as they are in treating these two different materials. * * * The claims of the Perkins patent in suit do not require that the old material be either removed or retained. I have before pointed out that in operations under the Perkins process with a new pavement, where simply a depression had to be filled up, the surface is merely softened so that it could be picked up and opened and the new material added. Generally, in repairing old pavements, there is dead matter which must be removed, as I have pointed out; and, if the pavement has not sunk, it is necessary to rake out sufficient material to allow for the introduction of the fresh material. As I understand the Perkins patent and claims, the process thereof could be carried out whether or not the old material was removed."

Henry N. Moss, superintendent of streets, District of Columbia, a witness for the complainant, testified: "Under the Perkins heater system, the old or poor stuff is burnt out until the burning reaches good material. The depth of this burning under the present specifications was required to be at least three-quarters of an inch. I have seen repairs made where the depth was less, and the repairs were made in first-class order. This burnt-out material is then scraped out, and under the present District specification the surface must be reheated again before the asphalt that is used to make the repairs is put in. It is then rolled with a steam roller. * * * RX-Q. 227. At the bottom of the heated spot, what decides the operator as to the amount of old material to be raked off? A. His judgment, probably, in other places than Washington. In Washington the specifications require three-quarters of an inch, at least."

William H. Lober, the general superintendent of the Vulcanite Paving Company of Philadelphia, "familiar with methods and apparatus for repairing asphalt pavement" since 1886, testified in behalf of the complainant, and on cross-examination answered as follows: "X-Q. 196. In laying a new asphalt pavement, when the job is left incomplete at night, and the men begin their work anew on the day following, what precaution, if any, is observed in effecting a secure joint at the junction between the pavement already laid and the fresh filler just about to be applied next thereto? A. There are several ways of making surface joints. The best joint is made by the Perkins surface heater, making a sloping joint. Joints are sometimes made by just cutting the edge roughly with an ax, and piling the hot mixture along the edge until it can be softened and broken down, thus making a union of the two parts. Q. This mode of jointing, wherein the hot material is piled over the cut edge of the pavement already laid, how long has it been practiced, to your knowledge? A. Ever since I have been in the business."

In the Beckwith report to United States commissioners, Paris Exposition

1867, the manner of resuming and continuing the work of laying asphalt pavement from day to day is thus described: "To resume the work of the previous day, the edge of the solid asphalt must be cleared of dust and loose particles, and a layer of hot asphalt thrown upon it to heat it. When the edge is sufficiently heated, the layer thus thrown down is removed and returned to the furnace for reheating; and as this removal takes place a hot layer from the carts is thrown down and spread, and the packing immediately commenced as before described. The edges of the old and new work thus unite perfectly, and no joint or seam remains visible."

The final brief for the appellant contains the following: "If the * * * premise of the opinion of Judge Coxe to the effect that 'any heating device * * * is within the claim' be true, then the * * * conclusions (1) that this claim places 'the entire art of repairing asphalt pavements by heat under tribute to the patent in suit,' and (2) that this patent is anticipated by the Crochet patent, necessarily follow. But if it appear that this patent, intelligently read, discloses and claims a particular and novel application of (blast) heat (to the proper depth or degree) by a new apparatus, which Judge Coxe himself says is 'an ingenious gasoline heater,' then it inexorably follows that the patent should be sustained."

James H. Raymond, for appellant.

James H. Peirce, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The contention of the appellant has been narrowed by counsel and by the experts to the assertion that the Perkins "method is characterized by a new and useful way of applying heat to the pavement, to wit, by sending a flame blast into direct contact with the pavement surface." This, it is insisted, must follow from an intelligent reading of the claim in connection with the specification. The specification, instead of aiding, explicitly and absolutely forbids, the proposition. A blast, it is true, is the certain result of the one apparatus which is described as a means of applying the heat; but, unwilling to abide by that, the patentee proceeded to add:

"The heating of the surface may be accomplished in various ways, and by means of various forms of apparatus; and, while I have shown but one form, * * * I would have it understood that I do not limit myself to any particular form of apparatus."

The reference, of course, is to existing and known "ways" and "forms of apparatus," and not, as one of the experts irrelevantly suggested, to "different and improved forms of apparatus affecting the efficiency of the method, * * * since devised," which "all retain the obviously best idea of using a liquid fluid, * * * not essential to the flame blast, and, of course, not essential to the contact of the flame with the pavement." According to the same witness, the Perkins patent was "the first disclosure in the art of any apparatus by which heat may practically be imparted to an asphalt pavement on this principle," and the well-chosen words of the first claim are in strict harmony with the unmistakable purpose of the patentee to include in his method all of the "various ways" possible of heating the surface to be affected, and the operation of every

known form of apparatus capable of being used in any way to the accomplishment of the proposed end. It was then well known "that heat could be used to soften a Trinidad asphalt pavement at the spot to be repaired." The process of softening the hardened edges of a pavement in course of construction, as the work ceases and is resumed from time to time, was familiar. As a means of bringing heat to bear on a spot of pavement to be softened, the apparatus of Crochet was known, and that a like device could be used with a measure of success upon the asphalt pavements in common use in this country was established in the case in the Second circuit to which reference has been made. Another objection to the proposed limitation of the claim by making it read "a blast of heat," or "a strong blast of heat," in lieu of the unqualified word "heat," is in the fact that the third claim, which contained the additional words, was withdrawn by the patentee upon a ruling or declaration of the patent office that the first and third claims were the same in substance, and could not both be permitted to remain in the case. That was not merely a casual expression of opinion by an examiner, but was in effect a requirement that one or the other of the claims be withdrawn, and no reason is perceived for not applying the ordinary rule. Having voluntarily abandoned the claim for a method limited to the use of "a blast of heat," the patentee or his assignee may not now insist that a broad claim, containing no suggestion of such intention, shall nevertheless be subjected by construction to the same restriction. This point, in view of the reservation already considered, is unimportant, and might be passed; but it is to be observed that, if the third claim was withdrawn by mistake, a correction should have been sought in the patent office, either by a surrender and reissue, or possibly by a new application. It is not within the rightful power of the courts to enlarge or restrict the scope of patents which by mistake were issued in terms too narrow or too broad to cover the invention, however manifest the fact and extent of the mistake may be shown to have been. The problem which Perkins undertook to solve, it seems clear, was one which invoked the powers of invention, but it was much more narrow than it has been treated. It was not to find a method and means of repairing asphalt pavements by "subjecting the spot to be repaired to heat, adding new material, and smoothing and burnishing it." It was to find a new and better method and means of accomplishing the one step of heating, and if a patent on the method, as distinguished from the apparatus, was to be sought, and was allowable, a more appropriate, if not the only proper, description would have been, not "a method of repairing asphalt pavement," but a method of heating an asphalt pavement for the purpose of repair, or, better than that, for the purpose of softening it at the spot to be dealt with, which, of course, might be for other purposes than repair, such as cutting through in order to reach or lay pipes underneath. Indeed, there seems to have been no reason for restricting either the method or apparatus to use upon any particular pavement. It is capable, evidently, of efficient employment upon all known kinds of asphalt pavement, and upon any accessible surface which it may be desirable to heat, but, of

course, with effects varying always according to the different qualities of the material operated upon.

Treating the invention as being simply for a method of applying heat, we incline to the opinion of one of the experts that the method itself was separately patentable. Though brought into play by a special apparatus for which Perkins sought and obtained another patent, it seems to be in part the result of elemental and natural forces, and not merely the functional result of the apparatus, and is therefore not within the doctrine of Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899. Once the apparatus was perfected, however, the process followed as a matter of course, and the inventive power by which it was evolved is not to be distinguished from that expended in devising the apparatus. The primary conception embodied in the apparatus is a blowpipe. Starting with that, and with the fire box of Crochet, with whose patent Perkins seems to have been familiar, and with a knowledge of the properties of gasoline or other "liquid fluid" which might be forced by atmospheric pressure through supply pipes to the burners, the task was not one for a pioneer. The apparatus of Crochet, as pointed out by Dayton, was defective and objectionable for reasons which are so obvious that they must have been anticipated; but the more serious objections, it is evident, could be removed by substituting for the grate bottom and the live coals any form of apparatus capable of producing and directing a blast of flame against the plate below. Such a flame thrown uniformly upon the thin sheet-metal plate of the device, so placed and adjusted as to be "a little above the surface of the pavement," could hardly be less potent than a direct impingement of the flame to produce the required effect upon the material to be softened, either for removal or for mixture with added new material. Whether in that way the thin crust could be produced which the direct contact of flame causes, the evidence does not show, but whether it could or could not is for the present purpose not important. The production of the crust is not a part of the process claimed, and, it is conceded, could not be. At most, it is an incidental, perhaps invariable, result of the practice of the process in the one way and by means of the one form of apparatus described. The testimony is that only by experiment was that result discovered or discoverable, and it does not appear when the discovery was in fact made,—probably not before the patent was issued, else it would, if possible, have been made the subject or incident of a special claim. It is unnecessary to go further into details. While it has been determined, and stands unquestioned in the case, that Perkins invented an improved and much more efficient apparatus for repairing asphalt pavement than any before known, and incidentally developed —invented—a new and useful method of applying the heat, yet, neither by itself nor in connection with the other steps mentioned in the claim, is that method covered by the patent.

The claim would seem to be invalid even if it could be said that the word "heat," as used, means a blast or strong blast of heat. So read, or read as it stands, is it not for an aggregation of steps which do not constitute a patentable combination? Whether the old material is

heated and softened in one method or by one means or another, the addition of new material seems to be a separate and independent act, and equally and more unmistakably so the final act of smoothing and burnishing. If these steps may be regarded as constituting a single process, because the final result is a repaired pavement, then, with equal propriety, and without constituting an aggregation, the preparation of the additional material to be used—all the steps of that preparation, and the bringing of it to the place for use, including the means used for bringing it—might be included in the claim.

The decree below is affirmed.